UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

Santander Consumer USA, Inc.,

      Plaintiff,

v.

Superior Pontiac Buick GMC, Inc.,

      Defendant.

_____/

Case No. 10-13181

Honorable Nancy G. Edmunds

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S AND DEFENDANT'S MOTIONS FOR SUMMARY JUDGMENT [92, 109, 120]**

Before the Court are Plaintiff Santander Consumer USA, Inc.'s motion for partial summary judgment and Defendant Superior Pontiac Buick GMC, Inc.'s motions for summary judgment.[1]  (Dkt. 109, 92, 120.)

In its motion for summary judgment, Plaintiff requests judgment on its breach of contract and fraud claims and against Defendant's counterclaims of breach of contract, fraud, negligent misrepresentation, money had and received, unjust enrichment, exemplary damages, and attorneys' fees and costs.

In its motion, Defendant seeks summary judgment on its breach of contract claim, argues that Plaintiff's fraud claims are barred, and even if they are not barred, that Defendant cannot be held liable for the actions of its employee, and that Plaintiff is not entitled to exemplary damages or attorneys' fees.

---

[1]Defendant has filed two motions for summary judgment that are essentially the same. The motions rise and fall with each other.  The Court only cites to the second motion.

For the reasons explained below, the Court holds that neither party is entitled to summary judgment on the breach of contract claim, because the contract is ambiguous. The Court further holds that the rule of *Hart v. Ludwig* forecloses the parties' fraud, silent fraud, and negligent misrepresentation claims.  The Court also holds that Defendant has not brought forth evidence to survive a motion for summary judgment on its fraud in the inducement claim.  And finally, the Court finds Plaintiff is entitled to summary judgment on Defendant's unjust enrichment/money had and received counterclaim.

I.    **Facts**

   **A. Overview**

Defendant is a car dealership located in Dearborn, Michigan.  Plaintiff is in the business of buying retail installment sales contracts.  Put another way, Plaintiff provided the financing that enabled customers to purchase cars from dealerships such as Defendant.  Here, Plaintiff provided financing for the car contracts between Defendant and a customer.  Plaintiff and Defendant's relationship began in 2001, when they entered into a retail installment sales agreement for automobile financing (the "Agreement").  (Def.'s Mot. for Summ. J., Ex. A, Agreement.) The Agreement provided that Defendant could submit proposals to sell/assign certain contracts  (the "Contracts") that it had made with customers for cars (the "Vehicles") to Plaintiff.

The deposition testimony shows that Plaintiff focused its retail installment sale contract purchasing on credit-challenged applicants. (Def.'s Resp. to Pl.'s Mot. for Summ. J., Ex. C., Bronson Dep. at 63-64.)  For these contract purchases, Plaintiff charged interest rates of 24.99%. (Def.'s Resp. to Pl.'s Mot. for Summ. J., Ex. G, Kleibrink Dep. at 102.) Given the interest rate and the focus on credit-challenged applicants, Plaintiff anticipated

2

that the customer default rate was approximately 33%, or, one out of every three customer/cars. (Def.'s Resp. to Pl.'s Mot. for Summ. J., Ex. B, Magri Dep. at 33.)

### B. Financing overview[2]

When Plaintiff considers purchasing an automobile retail installment contract from Defendant, Defendant sends Plaintiff a Bookout Sheet. This Bookout Sheet contains information about the condition, equipment options, and identification of the automobile. Plaintiff alleges that it relies on these Bookout Sheets in deciding whether to purchase the contract. This lawsuit centers around 322 contracts on which the automobile owner defaulted. After a default occurs, Plaintiff states that it repossesses the vehicle, sells the vehicle at auction, and then applies the proceeds from the sale of the auction to the amount owing on the vehicle. When the auction house takes possession of the vehicle, it inspects the vehicle and enters the data into what is known as the AutoIMS database. Several hours after entering the initial data in the AutoIMS database, Plaintiff states that an inspector performs a more thorough manual inspection, the results of which are used to create a Condition Report. This Condition Report details the vehicle's condition and equipment options. The auction house then enters the data into the AutoIMS database and Plaintiff can access the information from that. Plaintiff then states that it routinely, and in the normal course of its business, compares the Condition Reports to the initial Contracts, Bookout Sheets, and other records to verify the condition and equipment of the vehicle involved.

### C. Facts giving rise to this lawsuit

---

[2]The following overview is from the Court's October 30, 2012 order denying Defendant's motions to strike. (Dkt. 137.)

3

For several years, the parties appeared to have no problems with their obligations under the Agreement.  But then customers started to default on their car payments and Plaintiff had the cars repossessed and had the majority of the cars sold at auction. Through this repossession and auctioning off, Plaintiff allegedly became aware that the cars that were the subjects of the contracts that it purchased from Defendant did not have the equipment that the Defendant allegedly represented the cars were originally equipped with.  Plaintiff states that it learned of these discrepancies when it compared the Bookout Sheets with the Condition Reports.  Plaintiff states that, because it paid for a contract that was supposed to represent a car with more equipment options, it overpaid for the contract and received a lower amount when the car was sold at auction than it should have received.

Plaintiff alleges that it has direct proof that Defendant committed fraud–for one of Defendant's employees, Liliana Sinishtaj, admitted to "power booking," the vehicles, that is, representing that certain equipment was on the cars when that equipment in fact was not, all to increase the value of the car.

In February, 2008, Sergeant Kenneth Muscat of the Dearborn Police Department investigated alleged fraudulent activity at the Defendant's dealership and specifically investigation Sinishtaj's actions.[3]  (Muscat Dep. at 7.)  From June 28, 2004 to January 28, 2008, Sinishtaj worked at Defendant's dealership.  (Pl.'s Mot. for Summ. J., Ex. H, Police Reports.)  Sinishtaj was the finance manager who assisted customers in getting financing

---

[3]At his deposition, Muscat testified that the Dearborn Police Department keeps such investigative reports in the regular course of its business.  (Muscat Dep. at 7.)  He stated that he used his notes, his memory, and his recollection of interviews to create his police report.  (*Id.* at 11.)

4

for car loans.  (*Id.*)  After interviewing Walter Schwartz, Defendant's president, Muscat wrote that the vehicles' values were determined by the equipment and options on the vehicles, and that Sinishtaj would include equipment and options that were not on the vehicles, to increase the vehicles' contract prices.  (*Id.*)  Muscat recounted that Schwartz discovered Sinishtaj's actions when the cars were repossessed due to the customers' inability to pay the loans.  (*Id.*)  Muscat stated that the "financing banks conducted an inspection of each vehicle and when the equipment didn't match the dealership paper altered by Sinistaj, [Defendant] was required to pay for the difference."  (*Id.*)  Muscat recounted that Schwartz stated that Defendant had to pay approximately $2,000.00 for each of the 72 initially identified vehicles.  (*Id.*)

Muscat also interviewed Defendant's sales manager, Mike Cohn.   (Pl.'s Mot. for Summ. J., Ex. H, Police Reports.)  Muscat recounted that Cohn informed him that all the customers with bad credit were sent to Sinishtaj for financing.  (*Id.*)  Cohn also told Muscat that Sinishtaj "power booked most of her loans."  (*Id.*)

Muscat also interviewed Sinishtaj during the investigation.   (Pl.'s Mot. for Summ. J., Ex. H, Police Reports.)  Muscat related that Sinishtaj stated that she power booked loans all the time.  (*Id.*)  Sinishtaj stated to Muscat that "power booking [was] a common practice and everyone [did] it."  (*Id.*)

The police investigation reports show that Sinishtaj pleaded guilty to nine counts of felony-unauthorized credit application.[4]  (Pl.'s Mot. for Summ. J., Ex. H, Police Reports.)

---

[4]Defendant argues that the police reports are inadmissible.  The Court disagrees. Federal Rule of Evidence 803(8) excludes certain public records, including investigative reports that set out "a matter observed while under the legal duty to report," including "factual findings from a legally authorized investigation."  *Moore v. Bannon*, 10-12801, 2012

After Plaintiff learned of the missing equipment, it alleges that it began seeking remedies to which it believed it was entitled. Schwartz testified that Plaintiff requested money from Defendant for the misrepresented equipment options, after the cars had been sold at auction and the equipment discrepancies were discovered. (Def.'s Resp. to Pl.'s Mot. for Summ. J., Ex. E, Schwartz Dep. at 176-77.) Plaintiff sent some of these demand letters five years after Defendant had purchased the Contracts. Schwartz stated that Defendant paid roughly $248,470.00 to Plaintiff for these demands. (*Id.*) Schwartz also

---

WL 2154274, at *8 (E.D.Mich. June 13, 2012) (Ludington, J.) (quoting Fed.R.Evid. 803(8).) The Rule "is based upon the assumption that public officers will perform their duties, that they lack motive to falsify, and that public inspection to which many such records are subject will disclose inaccuracies." *Id.* (citation omitted). The Rule "presumes the admissibility of an investigator's finding 'unless the sources of information or other circumstances indicate a lack of trustworthiness.'" *Id.* (citing Fed.R.Evid. 803(8)(C).). The party opposing the admission of the report must prove that the report is not trustworthy. *Id.* (citing *Hickson Corp. v. Norfolk S. Ry. Co.*, 124 F. App'x 336, 344 (6th Cir. 2005)).

"The Court may use four factors in assessing whether an evaluative report is trustworthy: (1) the timeliness of the investigation, (2) the special skill or experience of the official, (3) whether a hearing was held and the level at which conducted, and (4) possible motivation problems." *Bannon*, 2012 WL 2154274, at *8 (citing Fed.R.Evid. 803(8)(C) and the advisory committee notes). "This list of factors is not exclusive; any circumstance which may affect the trustworthiness of the underlying information, and thus, the trustworthiness of the findings, must be considered when ruling upon the admissibility of factual findings under this rule." *Id.* (quoting *In re Complaint of Paducah Towing Co., Inc.*, 692 F.2d 412, 420 (6th Cir. 1982)).

The Sixth Circuit has also stated that courts should apply Rule 803(8)(C) "in a common sense manner, subject to the district court's sound discretion in determining whether the hearsay document offered in evidence has sufficient independent indicia of reliability to justify its admission." *Bannon*, 2012 WL 2154274, at *8 (quoting *Miller v. Caterpillar Tractor Co.*, 697 F.2d 141, 144 (6th Cir. 1983). *See also Weinstein v. Siemens*, 07-15000, 2010 WL 4824952, at *4 (E.D.Mich. Nov. 22, 2010) (Borman, J.) (thoroughly reviewing the Rule 803(8) and holding, ultimately, that "[e]xclusion of an official report is warranted only if the court finds that 'the sources of information or other circumstances indicate lack of trustworthiness.'") (citation omitted).

Here, there is no indication that the police investigation reports are not trustworthy. Defendant points to no problems with the police reports and merely states that the reports are inadmissible because of hearsay. The Court finds the reports admissible.

testified that Plaintiff did offer Defendant to repurchase some of the allegedly misrepresented cars, roughly 20, which, Schwartz stated, Defendant did repurchase. (*Id.* at 75.)

At some point in time, though, Schwartz testified that Defendant stopped paying the amounts Plaintiff demanded because Defendant believed that Plaintiff had breached the Agreement, and that the Agreement did not entitle Plaintiff to the recourse it sought.[5]

This lawsuit followed.

## II.   Summary judgment standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

---

[5]One of Defendant's arguments is that Plaintiff had the means to and was contractually required to verify the equipment options on the vehicles. In discovery, Plaintiff admitted to conducting various interviews with various customers, but not all of the customers. ( Def.'s Resp. to Pl.'s Mot. for Summ. J., Ex. K, Pl.'s Objections and Responses to Def.'s Second Set of Req. for Admis.) Deposition testimony also reveals an issue of fact regarding the customer interviews. One witness testified that he did not know if, during the customer interview, Plaintiff asked about the equipment options on the vehicles. (Def.'s Resp. to Pl.'s Mot. for Summ. J., Ex. B, Magri Dep. at 59.) But he did state that he "believed that" Plaintiff's funding department "[j]ust verified the equipment on the vehicle that was on the bookout." (*Id.*) Another witness also stated that Plaintiffs "Funding department verifies the values of the vehicles." (Def.'s Resp. to Pl.'s Mot. for Summ. J., Ex. C., Bronson Dep at 66.) This witness explained that the verification process included "customer interview[s] to make sure [that Plaintiff] know[s] who [its] actually speaking with before [Plaintiff agree[s] to actually purchase the contract." (*Id.*) When questioned, Bronson agreed that one of the subjects of the customer interview was car accessories. (*Id.* at 67.) A third witness stated that the credit department "does not make any verification of the equipment." (Def.'s Resp. to Pl.'s Mot. for Summ. J., Ex. D, Chilton Dep. at 82.) But he stated that Plaintiff relied on the "compliance office" and that the compliance office, "through a customer interview" verified that "the equipment is on the vehicle." (*Id.*) He stated that, to his knowledge, Plaintiff conducted an "actual interview" that verified "each piece of equipment on the vehicle." (*Id.*) Chilton agreed when asked "[s]o, once the interview is conducted, there's a knowledge of the - - by Santander, through their Compliance department, of each and every accessory on the vehicle that a loan is going to be funded on; is that a true statement." (*Id.* at 82-83.)

Fed. R. Civ. P. 56(a).   A moving party may meet that burden "by 'showing' – that is, pointing out to the district court -- that there is an absence of evidence to support the nonmoving party's case."  *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986).  Revised Rule 56 expressly provides that:

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).  The revised Rule also provides the consequences of failing to properly support or address a fact:

> If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may:
>
> (1) give an opportunity to properly support or address the fact;
>
> (2) consider the fact undisputed for purposes of the motion;
>
> (3) grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it; or
>
> (4) issue any other appropriate order.

Fed. R. Civ. P. 56(e).  "The court need consider only the cited materials, but it may consider other materials in the record."  Fed. R. Civ. P. 56(c)(3).

When the moving party has met its burden under Rule 56, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts."

8

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Ultimately a district court must determine whether the record as a whole presents a genuine issue of material fact, drawing "all justifiable inferences in the light most favorable to the non-moving party." *Hager v. Pike Cnty. Bd. Of Educ.*, 286 F.3d 366, 370 (6th Cir. 2002).

### III.   Analysis

The Court first addresses the parties' breach of contract arguments.  The Court then addresses Plaintiff's fraud claims against Defendant.  The Court then addresses Plaintiff's arguments in support of its motion for summary judgment on Defendant's counterclaims.

#### A. Breach of contract claim

In Michigan, a breach of contract claim requires: (1) the existence of a valid contract between the parties, (2) the terms of the contract require performance of certain actions, (3) a party breached the contract, and (4) the breach caused the other party injury.  *Keiper, LLC v. Inteir Auto. Inc.*, 467 F. App'x 452, 459 (6th Cir. 2012) (citation omitted).

Here, the parties do not dispute that the Agreement governed their relationship.  The parties dispute what the Agreement's terms required of them.   Plaintiff argues that Defendant breached the Agreement when Defendant's employee, Liliana Sinishtaj, power booked the loans and misrepresented the Vehicles' equipments.  Defendant argues that the Agreement's terms are ambiguous and that Plaintiff had to offer the Vehicles to Defendant for repurchase.   Defendant maintains that the failure to offer the Vehicles for repurchase precludes Plaintiff from seeking the amounts owing on the Contracts.

#### 1. Michigan contract interpretation

9

Because this case is before the Court on diversity jurisdiction, the Court applies

Michigan's substantive law.  *Anton v. Nat'l Union Fire. Ins. Co. of Pittsburgh, PA*, 634 F.3d

364, 367 (6th Cir. 2011).

> In Michigan, the proper interpretation of a contract is a question of law . . . .
> The goal of contract construction is to determine and enforce the parties'
> intent on the basis of the plain language of the contract itself.  Michigan
> courts examine contractual language and give the words their plain and
> ordinary meanings.  If the language of the contract is unambiguous, the court
> construes and enforces the contract as written. . . . Only when contract
> language is ambiguous does its meaning become a question of fact.
>
> A contract is ambiguous if its words may reasonably be understood in
> different ways.  In other words, a contract is ambiguous when its provisions
> are capable of conflicting interpretations.   Courts cannot simply ignore
> portions of a contract in order to avoid a finding of ambiguity or in order to
> declare ambiguity.  Instead, contracts must be construed so as to give effect
> to every word or phrase as far as practicable.  However, courts may not
> impose an ambiguity on clear contract language.

*Chungag v. Wells Fargo Bank, N.A.*, 11-1353, 2012 WL 2301653, at *2 (6th Cir. June 19,

2012) (citations omitted). Additionally, "[a] specific contractual provision generally controls

over a related but more general provision."  *Loose v. City of Dearborn Heights*, 296368,

300964, 299214, 2012 WL 6050562, at *5 (Mich.Ct.App. Nov. 29, 2012) (citation omitted).

### 2. Sections 9 and 14 conflict and render the Agreement ambiguous as to whether Plaintiff had to deliver the vehicles to Defendant

Defendant alleges that at least two provisions conflict in the Agreement and render

it ambiguous.  The Court agrees.  Defendant maintains that Sections 9 and 14 of the

Agreement conflict.   Plaintiff maintains that Defendant violated Section 7 of the

Agreement.[6]

"Non-Recourse Dealer Retail Agreement."

7.  Dealer[Defendant]'s Representations and Warranties

So long as this Agreement is in effect, Dealer represents, warrants and agrees that to the best of the dealer's knowledge: . . . I. The Vehicle and all options therein are accurately described in the Contract and Such Vehicle was delivered by Dealer and accepted without condition or reservation by Buyer(s).

9. Dealer[/Defendant] Liability

A.  Repurchase.

If a Dealer representation, warranty or covenant made herein, or made in the assignment of a Contract to DFS is breached, or is untrue, or if Dealer fails to perform any of its obligations to DFS hereunder or otherwise, then Dealer shall pay DFS immediately upon receipt of DFS's demand, one or more of the following amounts at the sole election of DFS: (1) the unpaid balance, as determined by DFS, of the breached Contract purchased, less any unearned finance charges and any discounts in connection with such Contract; (2) all losses and expenses incurred by DFS as a result of such breach, or untruth, or failure to perform, including attorneys fees; and (3) out-of-pocket expenses paid or incurred by DFS in connection with the collection of any amount due under any such Contract, including attorneys' fees and costs of litigation, whether by or against DFS, and expenses with respect to repossessing, storing, repairing and selling the Vehicle.   If Dealer fails to repurchase any Contract as required by this Section 9, [Plaintiff] may, as its option; (I) allow the Contracts to pay to maturity; or (ii) upon ten (10) days written notice to Dealer, sell such Contracts purchased from Dealer at public or private sale. In either event, [Plaintiff] may apply the proceeds after deducting expenses and reasonable attorneys' fees, to the payment of Dealer's obligations hereunder, and Dealer shall be responsible for any deficiency. **[Plaintiff] will make every reasonable attempt to recover collateral and deliver collateral to dealer to complete repurchase**.

C.  Failure to Repurchase.

---

[6]"DFS" or "Drive Financial Services" was Plaintiff's former name.

> If Dealer fails to repurchase a Contract as required by Section 9, [Plaintiff] may, in mitigation of its damages, repossess the vehicle securing the Contract as may be allowed by applicable law, in which event Dealer will pay [Plaintiff], in case upon demand, in addition to any other sums provided for herein, all costs of repossession, including court costs and attorneys' fees, and all costs of reconditioning, storing and reselling the Vehicle.

> 14. Waiver.

> Dealer hereby waives any failure or delay on [Plaintiff]'s part in asserting or enforcing any right which [Plaintiff] may have at any time hereunder. Dealer hereby expressly waives notice of acceptance of this Agreement, notices of non-payment and non-performance, notices of amount of indebtedness outstanding at any time, protests, demands and prosecution of collection, foreclosures and possessory remedies all as may be permitted by applicable law.

Defendant argues that an ambiguity exists between Paragraph 9, Dealer Liability, and Paragraph 14, Waiver. (Dkt. 109, Def.'s Am. Mot. for Summ. J. ¶ 19.) Defendant argues that Paragraph 9's last sentence, which states that "[Plaintiff] will make every reasonable attempt to recover collateral and deliver collateral to dealer to complete repurchase," is a precondition to compel and repurchase by the dealer. (*Id.* ¶ 20.) Defendant maintains that Plaintiff did not satisfy the precondition in this case and therefore that Plaintiff cannot seek the listed recourse available in Paragraph 9. (*Id.*) Defendant states that Plaintiff did offer Defendant 20 or so of the initial vehicles for repurchase, which Defendant did, in fact, repurchase. (*Id.*) Defendant discusses Paragraph 14. Defendant argues that "[t]he concepts of waiving notice, and the concept that '[Plaintiff] will make every reasonable attempt to . . . deliver collateral to dealer to complete repurchase' conflict with one another." (*Id.* ¶ 22.) Defendant states that Plaintiff never offered any of the 322 vehicles for repurchase, nor did, Defendant states, Plaintiff give Defendant notice of the sale of the

12

vehicles.  (*Id.*)

Plaintiff argues that Section 9 required Defendant to repurchase the contract, and not the vehicle, in the event that Defendant violates one more of the Section 7 representations. (Dkt. 118, Pl.'s Resp. to Def.'s Mot. for Summ. J. ¶ 20.)  Plaintiff further argues that it has the contractual right to a remedy against Defendant for Defendant's misrepresentations even when the contract is not in default–arguing that the sentence "If Dealer fails to repurchase any Contract as required by this Section 9, [Plaintiff] may, at its option, (I) allow the Contract to pay to maturity; or (ii) . . . sell such Contracts purchased from Dealer at public or private sale. In any event, . . . Dealer shall be responsible for any deficiency." supports such a position.

Plaintiff argues that the "reasonable attempt" language is "clear and unambiguous that actual delivery of the vehicle is not required in order to 'trigger' [Defendant's] obligation to repurchase the Contract."  (Pl.'s Resp. ¶ 23.)  Plaintiff further suggests that courts "do not generally construe contract provisions as conditions precedent in the absence of express language."  (*Id.*) (citing 6A Michigan Law & Practice, Contract, § 232, at 259.)

The Court finds that the "reasonable attempt" language conflicts with the Waiver provision and creates an issue of fact whether the Waiver section supercedes and renders the "reasonable attempt" language nugatory.  Here, the "reasonable attempt to deliver collateral and deliver collateral to dealer to complete repurchase" language contemplates that repurchase would not be complete until delivery of the collateral took place.  This statement conflicts with the Waiver provision. The Waiver provision explicitly waives all of Plaintiff's failures, including possessory notification failures.  But, if Plaintiff sought

13

repurchase of the Contracts from Defendant, the "reasonable attempt" statement lends support to the proposition that delivery of the collateral should have taken place. A conflict of language exists and the Agreement is ambiguous.

While the Court will not go so far to hold that "reasonable attempt" language is a condition precedent, the Court does find that summary judgment is not appropriate.[7] *See BSI Land Co. v. Millpointe W. Ltd.*, 20968, 1999 WL 33441233, at *4 (Mich.Ct.App. June 18, 1999) (stating that, "courts generally do not construe contract provisions as conditions precedent in the absence of express language, particularly where such construction results in an injustice.") (and further stating, "this [condition precedent] argument raises an issue of contract construction dependent on the intent of the parties."); *and see Opdyke Inv. Co. v. Norris Grain Co.*, 320 N.W.2d 836, 838 (Mich. 1982) ("Summary judgment is rarely appropriate where 'motive and intent play leading roles.'").

Given that the Agreement contains an explicit "reasonableness" condition, the Court finds that summary judgment is not appropriate. Plaintiff concedes that position. *See*

---

[7]A condition precedent "is a fact or event that the parties intend must take place before there is a right to performance." *Harbor Park Market, Inc. v. Gronda*, 743 N.W.2d 585, 588 (Mich.Ct.App. 2007) (citation omitted). "If the condition is not satisfied, there is no cause of action for a failure to perform the contract." *Id.* "[W]hen a contract contains a condition precedent, 'there is an implied agreement that the promisor will place no obstacle in the way of the happening of such an event[.]" *Id.* (citation omitted). "Where a party prevents the occurrence of a condition, the party, in effect, waives the performance of the condition." *Id.* at 589. "Whether a provision in a contract is a condition the nonfulfillment of which excuses performance depends upon the intent of the parties, to be ascertained from a fair and reasonable construction of the language used in the light of all the surrounding circumstances when they executed the contract." *MacDonald v. Perry*, 70 N.W.2d 721, 725 (Mich. 1955) (citation omitted). The Court finds that the "reasonable attempt" language is not expressly a condition precedent.

(Pl.'s Resp. ¶ 24.)  (Plaintiff argues, that, even if the Court were to 'entertain' the condition precedent argument, that whether Plaintiff made "every reasonable attempt" to recover and deliver the collateral to the dealer would be a question of fact that was inappropriate for summary judgment.[8]).

### 3.   The Court rejects Defendant's nonrecourse argument

Defendant argues that Plaintiff's "recourse" was to repossess the vehicles once they went into default.   (Def.'s Mot. for Summ. J. ¶ 17.)   Defendant maintains that the Agreement gives Plaintiff no rights against Defendant.   (*Id.*)  While Defendant does offer the Court the appropriate definition of nonrecourse, the Court finds that the Agreement does not support Defendant's argument.[9]

Here, the Agreement specifically provides that Plaintiff can seek from Defendant a "deficiency" on the Contract.  The Agreement therefore describes the recourse the parties have if a breach occurs and entitles Plaintiff to seek deficiency amounts from Defendant. The Court rejects Defendant's nonrecourse argument.

-------

[8]Plaintiff further explains that it had a duty to its customers to sell the vehicles "as quickly as possible to mitigate depreciation and prevent damage to the collateral." (Pl.'s Resp. ¶ 24.)  Plaintiff argues that, given the nature of the cars and their repossession, holding the cars at the auction until an inspection occurred would be impossible.  (*Id.* ¶ 25.)

[9]"Nonrecourse" normally indicates a "loan that is secured by a pledge of collateral, but for which the borrower is not personally liable."  *Gonzales v. U.S.*, 08-3189, 2011 WL 835554, at *2, n. 1 (N.D.Cal. Mar. 4, 2011) (and quoting, "[n]onrecourse simply means that the lienor may look only to the property subject to his lien to satisfy his debt and cannot look to the debtor personally for payment.") (citation omitted).

Nonrecourse: "Of or relating to an obligation that can be satisfied only out of the collateral securing the obligation and not out of the debtor's other assets."  Black's Law Dictionary (9th ed. 2009).

### 4.  Defendant has not supported its § 440.9611 argument

Defendant argues that Michigan Compiled Law § 440.9611 required Plaintiff to give notice to Defendant before Plaintiff disposed of the collateral, here, the vehicles.  (Def.'s Mot. for Summ. J. ¶ 23.)   Defendant suggests that that failure to give notice of the disposition of the collateral "completely bars the creditor from recovering a deficiency judgment." (*Id.* ¶ 25.)  Defendant argues, citing *Asset Acceptance Corp. v. Robinson*, 625 N.W.2d 804 (Mich.Ct.App. 2001), that failure to give notice before disposing of collateral completely bars the creditor from recovering a deficiency judgment.

Michigan Compiled Law § 440.9611 does provide that a secured party must give an interested party, such as debtor or any secondary obligor, "reasonable authenticated notification" before the secured party disposes of any collateral.

Plaintiff counters that Defendant "failed to present any evidence that it is the 'debtor' or 'secondary obligor' on the contracts at issue, and therefore [§440.9611] on which [Defendant] relies does not apply[.]" (Pl.'s Resp. to Def.'s Mot. for Summ. J. ¶27.)

The Court agrees.  Defendant has not shown that the Michigan Uniform Commercial Code Article 9 applies to it.  The Court therefore finds this argument not well-supported and rejects it.

### 5.  The Court rejects Defendant's damages argument

Defendant argues that Plaintiff is improperly seeking a windfall with its damages claim.  (Def.'s Mot. for Summ. J. ¶¶ 28-29.)  Defendant maintains that Plaintiff cannot seek the entire alleged "unpaid balance," "(amount owed for the vehicles [Plaintiff] placed in

16

default for non-payment by the customers.)" (*Id.* ¶ 29.)   The Court rejects this argument. If Plaintiff is entitled to damages, the Agreement provides that, in the event that Defendant breaches the Agreement, Plaintiff can seek :

> (1) the unpaid balance, as determined by DFS, of the breached Contract purchased, less any unearned finance charges and any discounts in connection with such Contract; (2) all losses and expenses incurred by DFS as a result of such breach, or untruth, or failure to perform, including attorneys fees; and (3) out-of-pocket expenses paid or incurred by DFS in connection with the collection of any amount due under any such Contract, including attorneys' fees and costs of litigation, whether by or against DFS, and expenses with respect to repossessing, storing, repairing and selling the Vehicle.

The "unpaid balance" is exactly what the Agreement provides to Plaintiff in the event of a breach.

Defendant also argues that Plaintiff originally only demanded the amounts for the alleged missing equipment and that Plaintiff cannot now seek the entire unpaid balance. (Def.'s Mot. for Summ. J. ¶ 39.)  Defendant maintains that Plaintiff is quasi-estopped from asserted a different damages theory.  (*Id.*)  Plaintiff counters that the demand letters initially were a compromise offer for the missing equipment only, and that the letters in no way prevent it from seeking what it maintains it is entitled to under the Agreement.  Plaintiff also counters that Michigan courts have long-rejected the quasi-estoppel theory.  The Court agrees with Plaintiff.  The demand letters do not bind Plaintiff to a damages claim and Michigan has not sanctioned the quasi-estoppel theory.  *See Kung Chiu Chu v. Grange Ins. Co.*, 304603, 2012 WL 5065313, at *5 (Mich.Ct.App. Oct. 18, 2012) (noting that Michigan courts have never formally adopted quasi-estoppel.).

### 6.  Breach of contract conclusion

17

For the above-stated reasons, the Court finds that neither party is entitled to summary judgment on the breach of contract claim. Sections 9 and 14 conflict and the Court finds that insufficient evidence has been presented for the Court to conclusively determine the intent of the parties in drafting the conflicting sections. The jury will therefore be tasked with determining the intent of the parties and the meaning of the Agreement's conflicting sections.

**B. Plaintiff's fraud claim**[10]

Plaintiff argues that it is entitled to summary judgment on its fraud claim. Plaintiff argues so, stating that an employee of Defendant, Liliana Sinishtaj, admitted to perpetrating the fraud alleged in this case.

Defendant argues that the Court cannot consider police investigation reports, that an employer is not liable for unforeseeable acts of an employee, that Plaintiff has not pleaded fraud with particularity, and that Plaintiff cannot succeed on its fraud claims when it did not reasonably rely on any misrepresentations.

**1. The rule of *Hart v. Ludwig* bars Plaintiff's fraud claim**

---

[10]To prove fraud, a plaintiff must show: (1) that the defendant made a material representation; (2) that was false; (3) that the defendant knew that the representation was false when it made the representation, or made the representation recklessly, without any knowledge of its truth and as a positive assertion; (4) that the defendant made the representation with the intention that the plaintiff would rely upon it; (5) that the plaintiff did, in fact, rely upon the misrepresentation; and (6) that the plaintiff was injured by the reliance on the misrepresentation. *City of Novi v. Robert Adell Children's Funded Trust*, 701 N.W.2d 144, 152, n. 8 (Mich. 2005) (citation omitted). Fraud must be proved by clear and convincing evidence. *Cooper v. Auto Club Ins. Ass'n*, 751 N.W.2d 443, 451 (Mich. 2008). "[D]irect proof of fraud is not required, and fraud may be proven by inference from facts and circumstances." *Foreman v. Foreman*, 701 N.W.2d 167, 176 (Mich.Ct.App. 2005).

On November 13, 2012, the Court issued a text only order noticing the parties that it thought the economic loss doctrine may play a role in the case's disposition.  (Dkt. 138.) The Court pointed the parties to *Rinaldo's Construction Corp. v. Michigan Bell Telephone Co.*, 559 N.W.2d 647 (Mich.1997).  At the hearing, Defendant argued that the economic loss doctrine only applied in sale of goods Uniform Commercial Code cases.  Defendant is correct that the phrase "the economic loss doctrine" applies solely in U.C.C. cases[11].  But

---

[11] *See* Vincent A. Wellman, *Assessing the Economic Loss Doctrine in Michigan: Making Sense out of the Development of Law*, 54 Wayne L. Rev. 791 (2008).  In this article, Professor Wellman discusses the differences between the rule enunciated in *Hart v. Ludwig*, 79 N.W.2d 895 (Mich. 1956), and the economic loss doctrine formerly adopted by the Michigan Supreme Court in *Neibarger v. Universal Coop., Inc.*, 486 N.W.2d 612 (Mich. 1992).  Professor Wellman also points out how courts have often confused and conflated the two principles.   He explains:

> The economic loss doctrine has an obvious relation to, and affinity with, another feature of Michigan common law which predated [*Neibarger*].  In Michigan, as elsewhere, courts have struggled for some time with the task of drawing the boundary between tort and contract. [*Hart v. Ludwig*] is still the leading case in this state for drawing that boundary, which relegates claims of injury to contract law unless there is a tort duty that would exist independent of the duties created by the parties' agreement.  In application, [*Hart*] is often cited as authority to dismiss tort claims if they assert the breach of a duty that, on analysis, is shown to be no different from an obligation that is part of the parties' contract.  The most vulnerable such claims will obviously be suits for the "negligent" performance of duties that were part of a contract.

*Id.* at 797-98.  Professor Wellman continued,

> There is one last observation to be made about the difference between [*Hart*] and the economic loss doctrine.  The rule of [*Hart*] requires an analysis of the actual provisions of the contract at issue before a court can properly dismiss the tort claims.  For, one can determine that the alleged tort duty is independent from the parties' contract only by examining that contract's provisions: a duty of, say, disclosure might be subsumed by the representations and warranties found in one contract but might be independent of another agreement's terms.

Defendant is incorrect in arguing that similar, related, Michigan principles do not bar its fraud claims.

"The law in Michigan is well-settled that an action in tort requires a breach of duty separate and distinct from a breach of contract." *Brock v. Consolidated Biomedical Lab.*, 817 F.2d 24, 25 (6th Cir. 1987). The *Brock* court pointed to *Hart v. Ludwig*, 79 N.W.2d 895 (Mich. 1956) as the authority for this rule. In *Hart*, the plaintiffs filed suit against the defendant for his failure to perform work on an orchard, as was required by a verbal contract between the parties. 79 N.W.2d at 895. The plaintiffs sued the defendant for negligence. *Id.*

The court framed the issue as whether the plaintiffs could maintain a negligence tort action for the defendant's failure to perform the contract. *Hart*, 79 N.W.2d at 895. The court held that the plaintiff could not maintain the tort when the defendant's actions, the failure to perform the contract, only breached the terms of the contract. *Id.* at 897.

The court quoted with approval, "[w]hen the cause of action arises merely from a breach of promise, the action is in contract." *Hart*, 79 N.W.2d at 897 (citation removed). The court then stated, "[t]he action of tort has for its foundation the negligence of the defendant, and this means more than a mere breach of a promise." *Id.* (citation omitted).

The court then held:

> We have simply the violation of a promise to perform the agreement. The
> only duty, other than that voluntarily assumed in the contract to which the

---

*Id.* at 824. The Court has reviewed the article, cases, and arguments Professor Wellman addresses and finds that his position is on point and relates to this case.

20

> defendant was subject, was his duty to perform his promise in a careful and skillful manner without risk of harm to others, the violation of which is not alleged.   What we are left with is defendant's failure to complete his contracted-for performance.  This is not a duty imposed by the law upon all, the violation of which gives rise to a tort action, but a duty arising out of the intentions of the parties themselves and owed only to those specifics individuals to whom the promise runs.  A tort action will not lie.

*Id.* at 898-99.

Forty years later, the Michigan Supreme Court, in *Rinaldo's Construction Corp. v. Michigan Bell Telephone Co.*, 559 N.W.2d 647 (Mich. 1997), discussed, explained, and reaffirmed the *Hart* rule.  The court noted that Michigan courts have recognized the challenges in filtering out the contract-based fraud claims.   *Id.* at 656 (Mich. 1997) (The question whether an action in tort may arise out of a contractual promise has not been without difficulty.") (citation omitted).

"[T]he threshold inquiry is whether the plaintiff alleges a violation of a legal duty separate and distinct from the contractual obligation."  *Rinaldo's*, 559 N.W.2d at 658.  If the fraud claim is indistinguishable from the contract claim, a party cannot succeed on the fraud claim. The court explained the distinction further by quoting:

> *Misfeasance or negligent affirmative conduct in the performance of a promise generally subjects an actor to tort liability as well as contract liability for physical harm to persons and tangible things.*   Generally speaking, there is a duty to exercise reasonable care in how one acts to avoid physical harm to  persons and tangible things.   Entering into a contract with another pursuant to which one party promises to do something does not alter the fact that there was a preexisting obligation or duty to avoid harm when one acts.

*Id.* (citation omitted).  But the court held that, "[t]his duty, however, [did] not extend to 'intangible economic losses.'"  *Id.* (citation omitted).   For those types of losses, "the

manifested intent of the parties should ordinarily control the nature and extent of the obligations of the parties[.]" *Id.* (citation omitted).

The court then stated that courts have made the distinction in various contexts, including employment contracts. *Rinaldo*, 559 N.W.2d at 658 (citations omitted). The court further pointed out that the U.C.C. had adopted a version of the distinction in sales contracts under the U.C.C., "under the rubric of the 'economic loss doctrine.'" *Id.* (citation omitted).

The Sixth Circuit quoted the following with approval, from *Prosser and Keeton on the Law of Torts*, § 92 at 656 (5th ed. 1984), to aid in a court's determination of whether a party is improperly framing a breach of contract claim as a tort:

> Tort obligations are in general obligations that are imposed by law on policy considerations to avoid some kind of loss to others. They are obligations imposed apart from . . . any manifested intention of parties to a contract or other bargaining transaction. Therefore, if the alleged obligation to do or not to do something that was breached could not have existed but for a manifested intent, then contract law should be the only theory upon which liability would be imposed.

*Brock*, 817 F.2d at 25 (citation omitted, emphases removed) (holding that "in the absence of this contract, the harm [the plaintiff] complains of would not exist" and therefore affirming the district court's dismissal of the fraud claim as it arose solely from the contract.) (And stating, "Plaintiffs' claim in tort cannot exist under Michigan law because plaintiffs do not claim that the defendant has caused any harm in the realm beyond the contract.")

Here, the alleged fraudulent conduct–the power booking of the Vehicles–arose solely from the Agreement. The alleged power booking did not induce Plaintiff to enter the

Agreement nor did it induce it to enter into additional undertakings. The alleged power booking and actions of Sinishtaj did not cause harm to Plaintiff distinct from those caused by the breach of contract. In Article 7 of the Agreement, Defendant represents that "[t]he Vehicles and all options therein are accurately described." Given that representation, the Agreement contemplates the misrepresentation of the Vehicles and their options. The sole recourse is the recourse provided in the Agreement. The fraud cause of action would not have existed absent the Agreement. The *Hart* rule therefore bars Plaintiff's fraud claim.

### 2. The *Hart v. Ludwig* rule also bars Plaintiff's silent fraud claim

Silent fraud "holds that when there is a legal or equitable duty of disclosure, '[a] fraud arising from the suppression of the truth is as prejudicial as that which springs from the assertion of a falsehood, and courts have not hesitated to sustain recoveries where the truth has been suppressed with the intent to defraud.'" *Titan Ins. Co. v. Hyten*, 817 N.W.2d 562, 577 (Mich. 2012) (insertion in *Titan*) (citation omitted). "Such a duty [to disclose] may arise by law or by equity; an example of the latter is a buyer making a direct inquiry or expressing a particularized concern." *Alfieri v. Bertorelli*, 813 N.W.2d 772, 775 (Mich.Ct.App. 2012).

Here, for the same reasons that the rule of *Hart* bars Plaintiff's fraud claim, so does it bar the silent fraud claim. *See Woodland Harvesting, Inc. v. George Pacific Corp.*, 09-10736, 2010 WL 2813339, at *10 (E.D.Mich. July 14, 2010) (Cohn, J.) (finding that the economic loss doctrine barred a silent fraud claim that was interwoven with the contract claim.). The Court notes that *Woodland* court applied the economic loss doctrine, but the Court finds the rationale applies similarly with the *Hart* rule. Again, here, the silent fraud

23

claim would not exist save for the Agreement. The Court therefore finds that *Hart* bars this claim.

## C. Exemplary damages

Plaintiff has alleged a cause of action for exemplary damages. "Exemplary damages are a class of compensatory damages that allow for compensation for injury to feelings." *McPeak v. McPeak*, 593 N.W.2d 180, 183 (Mich.Ct.App. 1999) (citation omitted). "In order to justify an award of exemplary damages, the act or conduct complained of must be voluntary and the act must inspire feelings of humiliation, outrage, and indignity." *Id.* (citation omitted). "The act or conduct must also be malicious or so wilful and wanton as to demonstrate a reckless disregard of [a] plaintiff's rights." *Id.* (citation omitted). "[T]he general rule is that exemplary damages are not recoverable absent allegation and proof of tortious conduct that is 'independent of the breach.'" *Casey v. Auto Owners Ins. Co.*, 729 N.W.2d 277, 286 (Mich. Ct. App. 2006). *See also Department of Agric. v. Appletree Mktg., LLC*, 779 N.W.2d 237, 245 (Mich. 2010) (stating that "in a first-party no-fault action, the insured may only recover no-fault benefits, but in a fraud action the insured may recover attorney fees, emotional-distress damages, and exemplary damages."). *See also Lawrence v. Will Darrah & Assoc., Inc.*, 516 N.W.2d 43, 45, n. 6 (Mich. 1994) (citation omitted) (Absent "allegation and proof of tortious conduct existing outside of the breach, exemplary damages may not be awarded in common-law actions brought for breach of a commercial contract."). "[E]xemplary damages in a contract case properly can be regarded as serving a compensatory purpose where they are given as compensation for kinds of harm that cannot easily be estimated in terms of money." *Mathis v. Controlled*

24

*Temperature, Inc.*, 275323, 2008 WL 782634, at * (Mich.Ct.App. Mar. 25, 2008) (citation, quotation marks, and insertions omitted).

But "[b]ecause exemplary damages are a sanction and not an independent cause of action, the [c]ourt will not analyze [the plaintiff's] claim for exemplary damages as a separate cause of action." *Woodland*, 2010 WL 2813339, at *1, n.3 (quoting *Sneyd v. International Paper Co. Inc.*, 142 F.Supp.2d 819, 822 (E.D.Mich. 2001)). The Court therefore dismisses this 'cause of action.' *See" Zora v. Bank of Amer.*, 2012 WL 3779169, at *3 (E.D.Mich. Aug. 31, 2012) (Battain, J.) (dismissing the exemplary damages claim because "[e]xemplary damages are a remedy, [not] an independent cause of action.).

### C. Defendant's counterclaims

Plaintiff argues that summary judgment is appropriate on Defendant's counterclaims. (Pl.'s Mot. for Summ. J. at 16.) Defendant has alleged counterclaims of breach of contract, fraud/promissory fraud in the inducement, negligent misrepresentation, money had and received, unjust enrichment, exemplary damages, and attorneys' fees.[12]   (Dkt. 24, Am. Countercl.)

#### 1.  Breach of contract

For the reasons discussed above, the Court finds that genuine issues of material fact exist whether Plaintiff or Defendant breached the contract.

#### 2.  Fraud/promissory fraud in the inducement

---

[12]The Court does not discuss the exemplary damages, as it is not a cause of action. The Court further does not discuss the attorneys' fees 'cause of action,'given that issues of fact exist for trial.

Defendant has alleged a fraud in the inducement claim.  Fraud in the inducement is pre-contractual, and therefore the that claim may escape the *Hart* rule.  *See e.g. Braun Builders, Inc. v. Kancherlapalli*, 09-11534, 2010 WL 846482, at *6 (E.D.Mich. Mar. 5, 2010) (Ludington, J.) (citation omitted).[13]

A party commits fraud in the inducement when it "materially misrepresents its future conduct, reasonably expects [the other party] to rely on the misrepresentation, and [the other party] does rely on the misrepresentation by taking a detrimental action [it] would not otherwise have taken."  *IF Properties, LLC v. Macatawa Bank Corp.*, 307554, 2012 WL 4799310, at *2 (Mich.Ct.App. Oct. 9, 2012) (citation omitted).  "A fraudulent misrepresentation requires a . . . *false representation*, not a . . . subjective misunderstanding of information that is not objectively false or misleading." *Id.* Put another way, "[f]raud in the inducement . . . addresses a situation where the claim is that one party was tricked into contracting. It is based on pre-contractual conduct which is, under the law, a recognized tort." *Huron Tool and Engineering Co. v. Precision Consulting Services, Inc.*, 532 N.W.2d 542, 544 (Mich.Ct.App. 1995) (citation omitted).

Plaintiff argues that the evidence does not show that Defendant relied on any representations as alleged in the amended counterclaim, arguing therefore that summary

---

[13]A "narrow exception to this rule recognizes that an actionable tort can be based upon a promise made without a present intention of performance, when the promise is given for the purpose of deceiving the promisee and influence his conduct." *Future Now Enterprises, Inc. v. Foster*, 860 F.Supp.2d 420, 428 (E.D.Mich. 2012). (Lawson, J.) "For a fraud claim to be viable based on a promise of future conduct, the party must have 'at the time of the promise, a then-existing bad faith intent to break the promise." *Id.* (citations omitted). Again, the Court notes that the *Braun* court is discussing the economic loss doctrine, but again, the Court finds that similar principles apply to the *Hart* rule.

26

judgment is appropriate.  (Pl.'s Mot. for Summ. J. ¶ 38.)  Plaintiff states that Schwartz's testimony proves that Defendant did not rely on any representation when Defendant entered into the Agreement with Plaintiff.  (*Id*. ¶ 39.)  Plaintiff additionally argues the fraud statute of limitations would bar any misrepresentation that it may have made in 2001.  The Court agrees with Plaintiff.  Plaintiff has pointed to a lack of evidence from Defendant for Defendant to support its fraud in the inducement claim.

Plaintiff argues the following,

- Mr. Schwartz identified the employees of Santander to which he credited the alleged misrepresentations and, in response to a question asking if he had ever spoken to any of those persons prior to entering into the parties' Dealer Agreement in 2001, Ms. Schwartz answered "No."

- Mr. Schwartz then testified that he had spoken with one or two employees of Santander at the time of entering into the [] Agreement in 2001, but that they made no misrepresentations at that time, stating, "Well, they turned to misrepresentations later, but not at the time it [the 2001 Dealer Agreement] was signed."

At Schwartz's deposition, the following exchange occurred:

Q: Okay. Now, this contract alleges that misrepresentations were made prior to . . . the 2001 contract was signed.  Can you tell me what those misrepresentations were?

[Schwartz]: Well, they turned to misrepresentations later, but not at the time it was signed.

Q: Okay.  What were the misrepresentations that were later made or turned out to be misrepresentations later?

A: Well, the staff of Drive, who met with me often, and after these two young ladies left, then it - - I think his name was Josh was the next guy, and I have since learned after all these depositions . . . that they all got paid on a

commission basis and their own interests were being served.  I don't think
Drive's interests were being served nor mine.  And their meetings they had
with me didn't - - didn't do what they promised to do.  We continually went
over how we were performing and what's happening, and they told me there
was no problems. [sic]

(Schwartz Dep. at 146-47.)

A: Okay. They told me there were no problems, we were one of the top
performers, and now I learn their whole income was based upon buying
deals, and I believe they were complacent and they - - they actually did
things that were improper by not protecting Drive, not protecting me, but
actually promoting these people into automobiles, they - - Drive was receiving
high fees, high interest rates, and they were buying people that were buying
into transportation at the time and they were knowingly that the business
practices were poor.

(*Id*. at 147.)

A: The misrepresentations were that they told me always that we were
performing well and there were no problems[.]

A: . . . . They also sat down there and on these automobiles, they didn't do
their due diligence or they're not doing it because they held interviews with
these people and they talked to every buyer prior to funding me, that at that
point they had an obligation to communicate to me if there was any difficulty,
they said there was none.  (*Id*. at 148.)

(*Id*. at 147-48.)

Defendant argues that summary judgment is not appropriate.  Defendant states that
Plaintiff "represented that it: offered a consistent approach to structuring its automobile
financing; processed the applications by its own evaluation system and models, and
provided field representatives to automobile dealers to facilitate the financing process;
would have systems, procedures, and qualified personnel reviewing, supervising and

28

guiding the financing for the dealers' customers; it had policies and procedures in place to verify and would verify customer information and vehicle information; and would only look to the collateral for recoupment of its losses."  (Dkt. 130, Def.'s Resp. to Pl.'s Mot. for Summ. J. ¶ 68.)  Defendant maintains that it relied upon Plaintiff's representations and promises when it entered into the agreement.  (*Id.*)  Defendant then states, that, beginning in 2006, Plaintiff began to "ignore its own procedures and failed to supervise personnel to review transactions for missing equipment, and looked to [Defendant] instead of only the collateral for recoupment."  Defendant summarily states that Plaintiff committed the elements of fraud.  (*Id.*)  Defendant then maintains that it would not have entered the Agreement, had it known "the truth."  (*Id.*)

Here, Defendant's fraud in the inducement claim fails because it has neither alleged nor brought forth evidence of Plaintiff's intent to induce Defendant into making the Agreement and Defendant has not shown that it relied on any misrepresentations or that it was induced, or 'tricked' into the Agreement.  Defendant argues that the statements Plaintiff's representatives made became misrepresentations in later years.  That statement is not sufficient, standing alone, to support Defendant's fraud in the inducement claim.

The Court grants Plaintiff's motion for summary judgment with respect to Defendant's fraud claims and dismisses those claims from this suit.

### 3.  Statute of limitations

Plaintiff alternatively argues that dismissal is appropriate for the fraud claims.  Fraud has a six year statute of limitations.  Mich. Comp. Law § 600.5813.  A plaintiff must, therefore, bring a fraud claim within six years from when the fraud claim accrued.  A fraud

action arises when the fraud is perpetrated. *Cooper v. Auto Club Ins. Ass'n*, 751 N.W.2d 443, 448 (Mich. 2008).

Plaintiff argues that any misrepresentations made in the 2001 Agreement would be barred by the statute of limitations. (Pl.'s Mot. for Summ. J. ¶ 40.) The Court agrees and finds dismissal on this ground appropriate as well.

### 4. Negligent misrepresentation

"A claim for negligent misrepresentation requires [a] plaintiff to prove that a party justifiably relied to his detriment on information prepared without reasonable care by one who owed the relying party a duty of care." *Alfieri v. Bertorelli*, 813 N.W.2d 772, 775 (Mich.Ct.App. 2012) (citation omitted). "[N]egligent misrepresentation [] require[s] a defendant to owe a duty to the plaintiff." *Id.* "[A] duty of disclosure may be imposed on a seller's agent to disclose newly acquired information that is recognized by the agent as rendering a prior affirmative statement untrue or misleading." *Id.* (citation omitted). "This is especially true when the agent knows that the buyer has a particular concern with the subject matter of that statement." *Id.* at 775-76 (citation omitted). "Indeed, a duty to disclose may arise solely because 'the buyers express a particularized concern or directly inquire of the seller[.]" *Id.* at 776 (citation omitted).

Plaintiff argues that Defendant's negligent misrepresentation claim fails as a matter of law because Defendant cannot show that Plaintiff owed a special duty, a fiduciary relationship, or any type of relationship that would give rise to the kind of "duty of care" necessary to support a claim of negligent misrepresentation. (Pl.'s Mot. for Summ. J. ¶ 41.) Plaintiff suggests that there is "no evidence" that Plaintiff made any "false statements,

30

negligent or otherwise, of verifiable facts as opposed to statements of opinion or promises of future conduct." (*Id.*)

In its response, Defendant conflates its fraud, fraud in the inducement, and negligent misrepresentation claims. (Def.'s Resp. at 24.)  Defendant states, in a conclusory fashion, that  it relied on misrepresentations in entering into and continuing the Agreement.  (*Id.*)  Defendant then states that Plaintiff, in 2006, "began to ignore" the Agreement and the representations made in it.  (*Id.*)  Defendant adds that it "would not have entered into the [] Agreement, done business or [continued] to do business with [Plaintiff] had it known the truth."  (*Id.*)

The Court finds that Defendant's statements are not sufficient to support a fraud or a negligent misrepresentation claim.  But regardless of the parties' arguments, the Court finds that the rule of *Hart* prohibits the negligent misrepresentation claim.  *See Irwin Seating Co. v. International Bus. Mach. Corp.*, 306 F. App'x 239 (6th Cir. 2009) (affirming the trial court's dismissal of a negligent misrepresentation claim on the basis that the economic loss doctrine prohibited the claim.).  Here, the negligent misrepresentation claim would not exist, save for the Agreement.  The only appropriate avenue of recourse, therefore, is the breach of contract claim.  And while the Court notes Defendant's statement that it would have not entered into the Agreement "had it known" the Court also notes that "[i]n virtually every contract case involving allegations of fraud, the plaintiff asserts that it would have demanded different terms or refused to sign the contract but for the defendant's misrepresentations.  Such a showing is insufficient to avoid the economic loss doctrine." *Woodland Harvesting, Inc. v. George Pac. Corp.*, 09-10736, 2010 WL 2813339, at *10

(E.D.Mich. July 14, 2010) (Cohn, J.).   The Court therefore dismisses the negligent misrepresentation claim.[14]

### 3. Money had and received/unjust enrichment[15]

For Defendant to succeed on its unjust enrichment claim, it must prove: "(1) receipt of a benefit by [Plaintiff] from [Defendant] and (2) an inequity resulting to [Defendant] because of the retention of the benefit by [Plaintiff]." *J&J Plumbing & Heating, LLC v. Tate*, 277824, 279838, 2008 WL 4891807, at *4 (Mich. Ct. App. Nov. 13, 2008) (citation omitted).

With its fifth and sixth counterclaims, Defendant alleges that it "provided a series of payments for alleged deficiencies in options and accessories for automobiles it repossessed." (Am. Countercl. ¶ 36.)   Defendant states that Plaintiff did not provide verification or authentication for the sums demanded.  (*Id.*)  Defendant then states that it paid and Plaintiff received those payments "with the knowledge that said payments were not called for or appropriate." (*Id.*)  Defendant continues, "Plaintiff took possession of the funds knowing the monies were not rightfully [Plaintiff's.]" (*Id.*)  The unjust enrichment claim does mirror the money had and received claim–Defendant alleges that Plaintiff received the benefits of the monies paid and the failure to return the monies in unjust, to the

---

[14]To the extent that Defendant asserts an ordinary fraud claim, the Court finds that the rule of *Hart* bars that claim as well.  Again, the Court finds the economic loss doctrine cases applicable here.  The Court has reviewed the Agreement and finds that the tort claims alleged, save for the fraud in the inducement claim, would not exist save for the Agreement.  *Hart* bars the tort claims.  Recovery is solely as provided for in the Agreement.

[15]The Court has already addressed how the unjust enrichment and money had and received claims mirror each other and how neither party has addressed whether money had and received is a viable claim in Michigan.  See Dkt. 22, March 29, 2011Order at 10, n. 3.

detriment of Defendant.  (*Id.* ¶ 39.)

Plaintiff alleges that Defendant's fifth and sixth counterclaims are basically the same claim–that Plaintiff made demand upon Defendant because of missing options on vehicles and that Plaintiff settled those demands through settlement payments.  (Pl.'s Mot. for Summ. J. ¶ 42.)  Plaintiff alleges that these accords and satisfactions cannot be undone, and therefore that these two claims cannot survive summary judgment.  (*Id.* ¶ 44.)

Defendant argues that it can prove these two claims.  (Def.'s Resp. to Pl.'s Mot. for Summ. J. ¶ 69.)  Defendant maintains that Plaintiff demanded "approximately $248,470" from Defendant through "extortion-type tactics."  (*Id.*)  Defendant states that Plaintiff's "efforts to seek damages from [Defendant] for [Plaintiff's] bad loans is improper and outside of the agreement."  (*Id.*)  Defendant ends with, "[Defendant] paid and [Plaintiff] received payments from [Defendant] with the knowledge that said payments were not legitimate or appropriate."  (*Id.*)

Schwartz stated that Defendant's request for relief, the $248,470.00, represented payments to Plaintiff for missing options or misrepresentations, is improper.  (*Id.* at 176-77.)  Schwartz stated that he was asking for the money back because he believed it should not have been paid.  (*Id.* at 177.)  He stated that he believed so because Defendant did not have a chance to look at the cars and buy back the cars as he states the contract entitled him to.  (*Id.*)  He said that he believed he was held hostage to make the demand payments. (*Id.*)  Schwartz added that Plaintiff told him that it had "interviewed customers before paying [Plaintiff] for [the] contract, and [Plaintiff] held up [the] contract sometimes because [Plaintiff] couldn't get in touch with the customers[.]" (*Id.* at 181.)

33

The Court agrees with Plaintiff.  As Plaintiff has pointed out:

> An accord and satisfaction is a separate and new contract that operates to discharge or terminate an existing debt.  The prior debt is discharged by a performance different from that which is claimed as due, and acceptance of such substituted performance.  Once tender has been made in 'accord' . . . consideration has been exchanged and the agreement cannot be rescinded.

*Larremore v. Metropolitan Life Ins. Co.*, 02-10153, 2003 WL 21488690, at *3 (E.D.Mich. June 23, 2003) (Lawson, J.) (all quotation marks and citations omitted).    "Generally, rescission of a contract will not lie except for mutual mistake or unilateral mistake induced by fraud."  *Smart v. Nationwide Mut. Ins. Co.*, 2007 WL 1452029, at *3 (MIch.Ct.App. May 17, 2007) (citation omitted).

The Court finds that Plaintiff is entitled to summary judgment on this counter-claim. Defendant has not brought forth evidence of mutual mistake or unilateral mistake induced by fraud.  Save for making the conclusory statement that Plaintiff demanded the payments in an 'extortion-like' manner, Defendant has not brought forth any evidence to these payments were not accords and satisfactions.  Plaintiff is entitled to summary judgment on this claim.

## IV.   Conclusion

For the above-stated reasons, the Court grants Plaintiff and Defendant's motions for summary judgment with respect to all the fraud claims alleged and Defendant's unjust enrichment/money had and received claim.  The only claims that go forth are the breach of contract claims against each other.

s/Nancy G. Edmunds
Nancy G. Edmunds
United States District Judge

Dated:  January 2, 2013

I hereby certify that a copy of the foregoing document was served upon counsel of record on January 2, 2013, by electronic and/or ordinary mail.

s/Carol A. Hemeyer
Case Manager